All right, we're sensing a theme here. Our third case for this morning is Baldwin against Acting Commissioner Berryhill. Mr. Sutterfield. If it may please the court and counsel, I'm Attorney David Sutterfield on behalf of the appellant David Baldwin. The case focuses on two questions. In physical therapy, Frankie found Mr. Baldwin functioning below the sedentary level. Was he aware of such words as faking, feigning, symptom magnification, not valid, not best effort? Obvious answer is he was aware of those. And that doesn't appear in the report at all. There's no finding by him that there's any action by Mr. Baldwin other than full and fair effort. Second question is, as between physical therapist Frankie and the administrative law judge, which of those two would have a better understanding of physical therapist Frankie's report? And again, that answer is very clear, and that is Mr. Frankie. So as a consequence, the ALJ, without pointing to some deficit in Frankie's report, just can't come along with scissors and snip out the finding that the rationale by which he limited Mr. Baldwin to less than sedentary work. There's no citation in any material by the ALJ, by the commissioner, at any level, that that's not an appropriate analysis in terms of this is the way it's done in the field. That doesn't exist. Is that concern what caused you to put the supplemental material from Dr. Frankie before the appeals council? Sure. The appeals council, as we understand, has the role of gatekeeper. I don't think they're necessarily the paradigm of gatekeeping. But when I see that the ALJ had, in fact, taken a pair of scissors, so to speak, and just snipped that out of the report, and said, oh, that's his thoughts, therefore we're back to he's capable of doing light work, that's inappropriate. My job then is to alert the appeals council so the case doesn't go up to the district court and land in this court, ultimately, that, hey, there's flashing red light. He's misinterpreted, misunderstood, and misconstrued the treater's, the evaluator's, opinion. So the evaluator's not restating his opinion. He's simply saying, hey, I see symptom magnification, and that's really what's implicit in the. . . So you're basically saying that this was clarification. It wasn't some new evidence, something. . . No. Trying to rehabilitate Frankie. Right. It's not to rehabilitate. If I meant symptom magnification, it would be there. If I meant faking, feigning, something of the ordinary that he was putting forth his best effort because of his thoughts. And as the court might note in my reply brief, I note pain is perceived. It's thoughts. It's how our brain works. Everybody's different. The commissioners on regulations take that into account. They acknowledge that different people perceive pain differently. And those of us who have done disability, we see some people, it's like, why weren't you in here two years earlier? You've been a steel worker or an iron worker. I don't get it. And you see other people as something far less, and they're hobbling around. They're barely moving. That's just classic. So, again, recognizing that they're a gatekeeper. Hey, flashing red light. He misinterpreted this. And let him analyze it appropriately. That didn't occur even at the outset. So, instead, that became that lynchpin. So, I believe that the ALJ worked his way backwards, found that, oh, here's something saying light work. I'm going to go back. Oh, here's an oncologist note. And we'll just skip over the rheumatology note two days later. But his primary problem is the rheumatoid arthritis, right? Correct. And what transpires then, if you think about it logically, then ALJ has the obligation to do a longitudinal evaluation of the evidence. So, jumps back to the oncologist. What happens after that? We see the medications increase. He goes, his ectrema increases from 680 to 800. It is injectable for anti-inflammatory. He's given a TENS unit. And he's put an inopana, which is a wicked, wicked opioid that the DEA is telling the manufacturer, get this off the market because of its addictive properties. That doesn't make sense that, okay, his disability ends, and then we give him all these interventions to deal with his complaints of pain, the thoughts that the ALJ cites in his decision. So you're just saying, you know, that the world didn't stop on May 16, 2014 when he sees the oncologist. Not at all. It's only two days later he's back to the other doctor to see the rheumatoid arthritis. Correct. And you see a deterioration in his condition as evidenced by the medication and as evidenced by Ed. It doesn't make sense that he is a doctor of physical therapy now. Physical therapist Frankie finds that he's not capable of performing sedentary work, and you see these medications. I mean, it makes no sense that you do all these interventions, but he was functioning better when he was getting those interventions than he was before. That doesn't make any sense. And that's because the ALJ did not take a longitudinal view. But we do take into account how well somebody does with the various interventions, with the medication, with the physical therapy, with whatever it may be. Correct. And that's why they gave him more. And then we have physical therapist Frankie's findings, which, as I noted in my brief, there's over 50 separate findings, objective findings, that Mr. Frankie made that verify his conclusion. So as a consequence, I don't begin to understand how the ALJ finds that he can, in essence, play doctor, which is what he did, and go ahead and just take the scissors out and just snip that out and say, oh, I can disregard that. He can't disregard it. It's all in one package. It's a holistic report. This is how he functions. Thank you. All right. Thank you. Ms. Gibbons? So, Ms. Gibbons, what's a price marker in a router, somebody who puts, like, physical prices on things?  The price marker, I believe, and I have the DOT explanations here. I can hardly wait for this process of revising the DOT to be over. Maybe those do away with rope climbing. Maybe they will. The price marker is someone who tickets items, I believe, in sort of a retail capacity. Does that even exist in today's Internet economy where all products have a barcode or some kind of QR code on them and people buying them from Amazon don't see a price? And that could very well be part of, you know, what the price marking is, is working with, you know, that coding as well. The way they work with that coding, I'll just tell you, is you program the computers in the store. So it's an IT job. It's not a $4.95 per item. It's also, I mean, if you go into any store, you'll see prices listed on when you're going into an actual retail facility, which I know that the Internet has made online shopping much easier, but there are still retail facilities that exist all over the place, and that's where you find, you know, the price marking jobs. I know that the VE did testify to the number of those jobs and kind of walk through the basis from the numbers from the Bureau of Labor Statistics and how those were broken down by the DOT code, and those were the two alternative jobs, actually. As opposed to the photocopy machine operator, which also seems wild to me. Yes, Your Honor. Anyway, I mean, a lot of this, though, has to do with, again, you know, the evidence that the ALJ was willing to take into account, and your opponent is concerned with the disregard of physical therapist Frankie, especially. Yeah, and to this point, Your Honor, I think what's really helpful is if we focus on this issue of materiality, and that's the question of whether these two paragraphs of addenda create a reasonable probability that the decision, the outcome would have been different, or they're so persuasive as to undermine the ALJ's decision. And I think it's really helpful because I'm concerned that we've sort of mischaracterized what that functional evaluation testing says, because his opinion and the bottom line opinion from that functional testing is the results of that testing show he could do the exertional requirements of light to medium work under the Department of Labor standards, which are the same for the agency. So when we say he could do it, what do we do with pain? I mean, somebody can do something, but if they're in intense pain while they're doing it and they've got to take a strong opioid, does that mean this is the person you want on your working floor who's z'ed off on an opioid? Well, Your Honor, the ALJ considered the treatment regimen. This, again, is one piece of evidence that supports the ALJ's decision about medical improvement in mid-May 2014. He definitely discusses Mr. Baldwin's continued complaints of various joint aches even after May 2014. Well, not just aches. I mean, aches might be somebody who overestimated what they could do in the gym. He's in a lot of pain. He testifies to this. Yeah. He also reports consistently actually beginning in February of 2014 before the ALJ finds medical improvement. We see this coming down the pipeline. He's telling Dr. Rashid, who is his treating rheumatologist, he's reporting beginning in February the Actemra dosage, which was increased again in December of 2013, that this is starting to really change his situation. He's starting to improve. He's reporting. I think he tapers off the steroids that he was taking because he says, my joints are feeling good. I'm experiencing less swelling, less aching. So he is reporting this starting in February. Then we get this cluster of treatment notes right around May 16th. So we have the oncologist treatment note on May 16th. But what about the two days later, the complaint to Dr. Rashid of pain, joints, neck, shoulder, and Dr. Rashid is still tinkering around with his medication? Absolutely, Your Honor. And the ALJ acknowledges that. And this is not a case where we're not saying, and the ALJ did not say that his rheumatoid arthritis was cured as of mid-May 2014. No, I mean, that's the problem actually. It's okay for a little while, but then by the end of the month it's bad. And usually vocational experts will testify that if somebody needs to miss more than two days of work a month, they're not employable. Yes, Your Honor, but the treating rheumatologist, Dr. Rashid, even in December 2014 looking at the functional testing that Mr. Frankie did, he opines it's a different opinion that he gave in September 2013. Well, couldn't that be the product of the trend line point that you were making, that there may have been some improvement here? The difficulty I have is how we can have any confidence that that disability date ends on May 15th in light of what Dr. Rashid is finding on the 18th and indeed in August as well. In August of 14, Baldwin is still complaining of significant pain in his shoulder, neck, and back. But he also, Dr. Rashid says that the RA seems to be better controlled in August 2014. And again, we have these other treating doctors as well, that Dr. Wagner, his primary care, found no active synovitis. He finds improvements in his mental conditions. He's given the option to change the way that he receives the Actemra. But under the substantial evidence test, don't we have to have a lot of confidence in the May 15th date? Yes, Your Honor. And I think, again, if you view this as a whole, we really see this improvement that starts earlier than even the May 16th date. We see it in February when we see the Actemra starting. These infusions are starting to really help him. This is different than the first year and a half or two and a half years where he had the initial diagnosis and they're making adjustments to the treatment regimen. He goes through a series of different immunosuppressants. We start to see in February the Actemra is working. But where do we see, suppose on a scale of 1 to 100, you have to be at a 60 before you can work. And he maybe starts out at a 20, and so he's really not doing well. And the treatments get him up to a 45. So he's improved, clearly, from a 20 to a 45. But he hasn't crossed that threshold over 60. So I'm interested in where we can see from the comments about improvement that this actually means you can work as opposed to, you know, I'm not lying in bed in agony all day long but still quite impaired. And to that point, Mr. Franke's December 2014 functional testing shows he can lift 27 pounds occasionally from floor to waist. He can lift 20 pounds occasionally waist to overhead. He can carry 25 pounds occasionally over a span of 30 feet. He can push and pull, I think it was 80 to 89 pounds. All day long? Occasionally. 40 hours a week? Occasionally. Right. So again, I mean, trying to get, that's a little bit like our problem with daily living. If you can do it once, great. You know, that's good. It means you're less disabled than you might be. But does that translate into the ability to have one of these jobs? You can also look at it, in addition to that functional testing, we have this treating rheumatologist opinion, which again, I think you need to look at how those change. In September 2013, Dr. Rashid is saying he has significant pain and significant fatigue that would require extra breaks. He's going to be absent more than three days a month. By December 2014, you see treatment notes reflecting improvement, and we have this functional testing, and Dr. Rashid then opines he's not checking the boxes next to severe pain and fatigue anymore. He's not opining that he's going to need additional breaks. But December 14 is not May of 14. Exactly. But we have the lead up, again, to the. . . But that's just a question about what's so magic about May. You know, isn't there some significant evidence that after May there are still problems? There's evidence. Here's this May 21, 14 note. Right. Where the doctor is saying he has severe rheumatoid arthritis, several immunosuppressants. He's on a bunch of things, Actemra, Arava, and methotrexate. But he's still calling it a severe condition. And, Your Honor, the ALJ acknowledges that. He finds that the RA is a severe impairment. But the diagnosis alone does not reflect an individual's functional abilities. In addition, as you mentioned earlier, if he has adjusted his treatment regimen to an extent to the point where he is feeling better, he is reporting significant pain improvement with very conservative treatment, like the TENS unit and physical therapy. But intermediate relief doesn't show that he could sustain full-time work, does it? In conjunction with the other treatment notes that all showed significant improvement, I think that the RA and, again, this RFC is a very reduced, light work. This is a very extensive RFC where the ALJ gave weight to the treating physicians. And he's 32 years old at the time of his alleged onset. So he obviously has severe impairments. The ALJ acknowledged that. And he accounted for those in his extensive RFC finding. I see that my time is up unless you have further questions. Any other questions? All right. No other questions, so thank you very much. Thank you. Anything further, Mr. Sutterfield? One thing that troubles me with the commissioner's argument from the ALJ's decision through the present time is that better controlled fails to take into account what disease we're talking about, which is rheumatoid arthritis. And we're talking about something that's a destructive process. And if the court recalls the Dr. Gertler's surgical report where he goes in and he opens his shoulder up and he says, all this junk comes pouring out and says, this is the worst I've ever seen. So this destructive process that's going on for which they're giving the injectables, he might be getting better, but it's still a downhill better. It's this rather than this. It's an autoimmune disease, right? Correct. I wanted to clarify that. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.